# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF IOWA
# WESTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>    Plaintiff,<br><br>vs.<br><br>CLYDE ALVIN HOFFMAN,<br><br>    Defendant. | CR06-4066-MWB<br><br>**REPORT AND RECOMMENDATION ON MOTION TO SUPPRESS** |

_____

On September 25, 2006, the defendant Clyde Alvin Hoffman filed a motion (Doc. No. 16) to suppress evidence taken from his person on June 27, 2006[1], and statements he made to law enforcement officers subsequent to his arrest. The plaintiff (the "Government") filed a resistance to the motion on October 10, 2006 (Doc. No. 22). The trial management order (Doc. No. 6) assigned motions to suppress to the undersigned for review, and the filing of a report and recommended disposition. Accordingly, the court held a hearing on the motion on October 11, 2006, at which Assistant U.S. Attorney Forde Fairchild appeared on behalf of the Government, and Hoffman appeared in person with his attorney, Assistant Federal Defender Priscilla Forsyth. The Government offered the testimony of Sioux City Police officer Josh Tyler.

The motion now is fully submitted, and the court turns to consideration of Hoffman's motion to suppress.

---

[1] A typographical error in the defendant's motion indicates these events took place on June 17, 2006, rather than June 27, 2006.

## BACKGROUND FACTS

Officer Tyler has been with the Sioux City Police Department since January 3, 2006. He came to the department after two years as a correctional officer with the Woodbury County Sheriff's office, and successful completion of the Iowa Law Enforcement Academy, where he received basic peace officer training. On June 27, 2006, Officer Tyler was in the twelfth week of the Sioux City Police Department's sixteen-week initial training period, which requires new officers to be accompanied by another officer when they go out on patrol. On that date, Officer Tyler was on patrol in a marked patrol car, accompanied by Officer Chad Sheehan. The officers were patrolling District 4 in Sioux City, Iowa, a busy district for drug, weapons, and gang activities. Officer Tyler testified that his specific focus is drug crimes, and he estimated he had made one to two arrests per day in and around District 4 during the weeks immediately preceding Hoffman's arrest, including one drug arrest the day before Hoffman's arrest, in an area about four blocks from the incident in question in this case. Officer Tyler had never been involved in a chase situation prior to June 27, 2006.

On June 27, 2006, at about 6:40 p.m., the officers were on routine patrol, traveling westbound on 14th Street. At the intersection of 14th Street and Jones, Officer Tyler observed two vehicles, facing in opposite directions, pulled up next to each other in the traveled portion of Jones. The vehicles blocked the roadway such that no other vehicles could go around them. Three pedestrians were standing between the vehicles, talking to the drivers. Another pedestrian was standing to the west of the two vehicles. Officer Tyler pulled up behind one of the vehicles. When the pedestrians saw the patrol car, they walked away in separate directions, and the two vehicles went on their way. At this time of the evening, in late June, it was still full light outdoors. The officers followed the vehicle in front of them as it drove north on Jones to 15th Street, where the vehicle turned left. As they continued following the vehicle, it made two more left turns, ending at a stop

light at 14th and Jackson, one block west of the point where the officers began following, and in the opposite direction from the vehicle's initial direction of travel. Officer Tyler pulled into the left-turn lane, next to the vehicle, a white Cadillac. He observed a woman driving the vehicle. The woman raised her arm up and turned her head away, as though she did not want to be seen. When the light changed, the Cadillac proceeded southbound on Jackson, and Officer Tyler turned left onto 14th. The officers had decided that instead of following the Cadillac, they would return to the intersection at 14th and Jones, to follow up with the pedestrians.

When the officers arrived at the intersection at 14th and Jones, three of the four pedestrians were still visible in the area. One individual was walking across a park at the northeast corner of the intersection. Two others were walking (though not together) southbound on Jones. One of the two individuals was walking at a normal gait. The other individual was walking hurriedly away from the scene. He had his right hand in his pocket, and he repeatedly looked over his shoulder to see where the patrol car was. Officer Tyler recognized this individual, later identified as Hoffman, as a man who had been standing between the two cars when they were stopped at the intersection. He recognized Hoffman's long, curly hair and his clothing – cargo-type pants in a camouflage print, a dark blue or black ball cap, and sunglasses with a silver frame. Officer Tyler recalled that Hoffman had been talking with the woman driving the Cadillac when the officers first arrived at the scene.

Officer Tyler testified that when he is on patrol, he looks for things that are unusual or out of the ordinary. He found Hoffman's actions to be unusual, and he decided to make an investigatory stop of Hoffman. Because Hoffman was walking quickly, Officer Tyler pulled up a couple of car lengths in front of Hoffman so the officers would have time to exit their vehicle before Hoffman reached the patrol car. As Officer Tyler pulled up, Officer Sheehan got out of the patrol car. Hoffman stopped, turned, and cut between two

parked cars, obviously changing course to avoid coming into contact with the officers. Officer Sheehan told Hoffman the officers wanted to speak with him, and Officer Tyler, who now was out of the patrol car, told Hoffman to remove his hand from his pants pocket. Hoffman responded, "Why?" Officer Sheehan stated the officers would like to speak with Hoffman for a moment. Hoffman then began to flee the scene westbound, and the officers gave chase. The entire time Hoffman was running from the officers, he continued to keep his right hand in his pants pocket – something Officer Tyler found very strange, and which raised his concern about what Hoffman might have in his pocket.

The officers chased Hoffman through the 1300 block of Jones, between two houses, and through a group of five to eight children. Officer Sheehan yelled at Hoffman to stop or he would be "Tased."[2] Hoffman continued to run, still with his hand in his pocket. He turned north into an alley. There was a utility pole in the alley, and when Hoffman reached the pole, he slowed briefly and turned to look over his shoulder at Officer Sheehan, who was the closest of the two officers to Hoffman. It appeared to Officer Tyler that Hoffman might be trying to take cover behind the pole, which was close to a building. Officer Tyler drew his firearm because he was concerned that Hoffman might have a weapon in his pocket. Although he had not seen a weapon, Hoffman's right hand remained in his pants pocket. When Hoffman turned to look at Officer Sheehan, Hoffman's back was to Officer Tyler. Officer Tyler testified the ideal target for Taser deployment is into a person's back. He drew his Taser with his left hand, still holding his

---

[2]In addition to their sidearms and batons, each officer was armed with a Taser, which one supplier describes as a "non-lethal . . . conducted energy weapon that utilizes compressed nitrogen to shoot two small probes up to 15 feet. These probes are connected to the weapon by high-voltage insulated wire. When the probes make contact with the target, the [Taser] transmits powerful electrical pulses along the wires and into the body of the target through up to two inches of clothing." *See* www.tbotech.com/advancedtaser.htm (noting the 15-foot range is the version sold to civilians, whereas police officers' weapons have a 21-foot range).

firearm in his right hand, and deployed the Taser onto Hoffman's back. At almost the same moment, Officer Sheehan also deployed his Taser onto Hoffman's body.

When the Tasers hit Hoffman, he immediately stiffened up and fell to the ground.[3] According to Officer Tyler, the Taser cycle lasts five seconds. Then the signal stops, and the Taser must be redeployed again. The officer stated that during the five-second cycle, Hoffman would have been unable to move his muscles voluntarily, but after the five-second interval, Hoffman would have been able to comply with the officers' directions. Officer Tyler repeatedly told Hoffman to remove his hand from his pocket, but Hoffman continued to keep his hand in his pocket. In addition, Officer Sheehan told Hoffman to stay on his stomach, but Hoffman rolled over onto his side and began attempting to sit up. Officer Tyler viewed Hoffman's actions as an increased threat, and he and Officer Sheehan both activated their Tasers again for another five-second cycle. Officer Tyler stated Hoffman was trying to yell something at the officers, but he never understood what it was Hoffman was attempting to say.

After the second stun ended, Officer Tyler again repeatedly told Hoffman to remove his hand from his pants pocket, and Officer Sheehan continued to tell Hoffman to stay on the ground. Hoffman failed to remove his hand from his pocket, and Officer Tyler deployed his Taser a third time. When this third cycle stopped, Officer Tyler again directed Hoffman to remove his hand from his pocket, and Officer Sheehan told Hoffman to remain on the ground and put his hands behind his back. Hoffman still did not remove his hand from his pocket, but he did place his left arm behind his back. Because Hoffman's right hand remained in his pants pocket, Officer Tyler was concerned that Hoffman might attempt to fire a weapon from inside his pocket. Officer Tyler moved

---

[3]One supplier indicates the electrical signal delivered by a Taser will "completely override the central nervous system and directly control the skeletal muscles, . . . caus[ing] an uncontrollable contraction of the muscle tissue," and physically debilitating the target "regardless of pain tolerance or mental focus." *Id.* The Taser stun will cause the muscles to "contract until the target is in the fetal position on the ground." *Id.*

away from Hoffman at a 45-degree angle, to remove himself from Hoffman's line of fire. Officer Sheehan also was moving to another vantage point. Officer Tyler then deployed his Taser a fourth time. During this Taser cycle, Officer Sheehan put his hands on Hoffman to restrain him. When the cycle ended, Hoffman finally removed his hand from his pocket. Nothing was in his hand. Officer Sheehan put Hoffman in handcuffs while Officer Tyler maintained his defensive position with his firearm drawn. A third officer then arrived at the scene. With Officer Tyler continuing to stand guard, Officer Sheehan and the other officer searched Hoffman. Inside his right pants pocket, where Hoffman had kept his hand, the officers found a loaded handgun. Also found on Hoffman's person were a small quantity of methamphetamine, some cash, and drug paraphernalia.[4]

After Hoffman's arrest, he was taken to a hospital, at his request, before he was taken to the jail. Later, at the jail, Hoffman apparently gave a post-*Miranda* statement to an ATF agent. (*See* Doc. No. 16-2, p. 4; Doc. No. 22-2, p. 2)

Officer Tyler testified he has received training in use of the Taser, and it is the policy of the Sioux City Police Department that a Taser is considered the least violent option to deal with a resistant or combative suspect due to the lower risk of injury to officers or suspects than other options, combined with the effectiveness of the Taser. According to the officer, the Taser is "very safe," and he is not aware of any deaths occurring from Taser deployment. Officer Tyler also was carrying an Asp baton[5] at the time, but he explained that in addition to the Taser's being the preferred method of force, he carries his baton on his right hip and he would have had to re-holster his firearm in order to remove the baton.

---

[4]Although no evidence was elicited at the hearing regarding anything other than the gun, both parties mention, in their briefs, that methamphetamine, cash, and drug paraphernalia were taken from Hoffman's pants following his arrest. *See* Doc. No. 16-1, p. 2; Doc. No. 16-2, p. 4; Doc. No. 22-2, p. 2.

[5]The officer testified an Asp baton is a collapsible, steel baton, 26" long.

## *DISCUSSION*

Hoffman argues the officers lacked reasonable suspicion that he was involved in criminal activity, and therefore they lacked grounds to stop and question him under *Terry v. Ohio*, 392 U.S. 1, 88 S. Ct. 1868, 20 L. Ed. 889 (1968). (Doc. No. 16- 1, p. 2) He argues further that even if the officers had grounds to perform a *Terry* stop, once they had Tased him the first time, he was completely incapacitated and, accordingly, in police custody, such that probable cause was necessary to arrest him. (*Id.*, citing *Florida v. Royer*, 460 U.S. 491, 500, 103 S. Ct. 1319, 1325-26, 75 L. Ed. 2d 229 (1983)) He claims no probable cause existed to justify his arrest, and therefore "the arrest was illegal and the items taken from his pockets were taken in violation of his Fourth Amendment Rights and should be suppressed." (*Id.*, p. 3) Hoffman also argues that any statements he made followed his illegal arrest, were without attenuating circumstances, and should be suppressed as "fruit of the poisonous tree" pursuant to *Wong Sun v. United States*, 371 U.S. 471, 83 S. Ct. 407, 9 L. Ed. 2d 441 (1963). (*Id.*)

The court finds the circumstances justified the officers' intrusion upon Hoffman's constitutionally-protected interest to be free from unreasonable search and seizure. To review the facts briefly, the officers observed Hoffman, in an area known for drug and weapons crimes, standing in the street with other pedestrians between two cars that were parked so as to block the roadway. When the officers returned to the area, Hoffman saw them and began walking away quickly, repeatedly looking over his shoulder, and keeping his right hand in his pants pocket. When the officers told Hoffman they wanted to speak with him and asked him to remove his hand from his pocket, Hoffman fled the scene. Notably, the evidence indicates Hoffman did not merely leave the area, as he states in his motion (*see* Doc. No. 16-1, p. 2); rather, he fled the scene, and continued to flee as the officers pursued him. The United States Supreme Court has held similar behavior justified officers in conducting a *Terry*-type investigative stop. *See Illinois v. Wardlow*, 528 U.S.

119, 124-25, 120 S. Ct. 673, 676-77, 145 L. Ed. 2d 570 (2000). Although Hoffman's mere presence in an area known for drug and weapons crimes is not indicative that he was engaging in criminal activity, the totality of the circumstances provided the officers with "specific and articulable facts which, taken together with rational inferences from those facts," reasonably warranted the limited intrusion contemplated by asking Hoffman a few questions. *See Terry*, 392 U.S. at 20-21, 88 S. Ct. at 1979-80.

Officer Tyler testified that when Hoffman began to flee, he had violated at least three laws – jaywalking[6], failing to obey a lawful order from a police officer[7], and eluding[8]. As a result, the officers had probable cause to arrest Hoffman. The officers then lawfully searched Hoffman incident to his arrest, *see United States v. Pratt*, 355 F.3d 1119, 1124 (8th Cir. 2004) ("The search of an arrestee's person has long been upheld as reasonable under the Fourth Amendment. . . ."), locating the gun and other contraband. Because Hoffman's arrest was lawful, his later statements to the ATF agent need not be suppressed under *Wong Sun*.[9]

---

[6]It appears the officer was in error in his belief that jaywalking is a crime in Sioux City, Iowa. Iowa law simply provides that when a pedestrian crosses the roadway at a point other than within a marked crosswalk or at an intersection, the pedestrian must yield the right-of-way to vehicles on the roadway. Iowa Code § 321.328. Although a city may adopt ordinances restricting where pedestrians may cross the roadway, *see id.*, the City of Sioux City explicitly has adopted section 321.28. Sioux City Mun. Code § 10.321.328.

[7]*See* Sioux City Mun. Code § 8.32.040 ("No person shall willfully fail or refuse to comply with any lawful order or direction of a peace officer.").

[8]*See* Sioux City Mun. Code § 8.32.010, making it "unlawful for any person to elude, attempt to elude, or fail to stop for a police officer . . . after the officer has given [a] visible and/or audible order or signal for the person to stop or desist from further movement."

[9]At the hearing, Hoffman confirmed that he is not seeking to suppress any particular statement, nor does he claim he made any pre-*Miranda* statements. He is asserting only the *Wong Sun* argument that his post-*Miranda* statements should be suppressed as fruit of the poisonous tree, arising from his unlawful arrest.

As a final matter, the court notes Hoffman has asserted vigorous objections to the officers' repeated use of their Tasers to subdue him. He argues the officers used excessive force in arresting him, and cites statistics from Amnesty International regarding deaths from law enforcement's use of Tasers. (*See* Doc. No. 16-2, p. 3) As discussed above, the officers had probable cause to arrest Hoffman. "The Supreme Court 'has long recognized that the right to make an arrest . . . necessarily carries with it the right to use some degree of physical coercion or threat thereof to effect it.'" *Crosby v. Monroe County*, 394 F.3d 1328, 1334 (8th Cir. 2004) (quoting *Graham v. Connor*, 490 U.S. 386, 397, 109 S. Ct. 1865, 1872-73, 104 L. Ed. 2d 443 (1989); citing, *inter alia*, *Draper v. Reynolds*, 369 F.3d 1270 (11th Cir. 2004), involving use of a Taser). Whether or not use of a Taser, once or multiple times, constituted excessive force under the circumstances of this case is beyond the scope of Hoffman's motion to suppress evidence.

## *CONCLUSION*

For the reasons discussed above, it is respectfully recommended Hoffman's motion to suppress be denied. Objections to this Report and Recommendation must be filed by **October 27, 2006**. Responses to objections, if any, must be filed by **November 3, 2006**.

IMPORTANT NOTE: Any party planning to lodge any objection to this Report and Recommendation must order a transcript of the hearing promptly, but not later than **October 19, 2006**, **regardless of whether the party believes a transcript is necessary to argue the objection**. If an attorney files an objection to this report and recommendation

without having ordered the transcript as required by this order, the court may impose sanctions on the attorney.

      **IT IS SO ORDERED.**

      **DATED** this 17th day of October, 2006.

      PAUL A. ZOSS
      MAGISTRATE JUDGE
      UNITED STATES DISTRICT COURT