# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF IOWA
# WESTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, <br><br> Plaintiff, <br><br> vs. <br><br> CLYDE ALVIN HOFFMAN, <br><br> Defendant. | No. CR06-4066-MWB <br><br> **ORDER CONCERNING MAGISTRATE'S REPORT AND RECOMMENDATION REGARDING DEFENDANT'S MOTION TO SUPPRESS** |

_____

## I. INTRODUCTION AND BACKGROUND

### A. *Procedural Background*

On July 27, 2006, an indictment was returned against defendant Clyde Alvin Hoffman, charging defendant, having previously been convicted of a felony drug offense, with conspiring to distribute 5 grams or more of pure methamphetamine, in violation of 21 U.S.C. §§ 841(a)(1), 841(b)(1)(B), 846 and 851, possessing with intent to distribute less than 5 grams of pure methamphetamine, in violation of 21 U.S.C. §§ 841(a)(1), 841(b)(1)(C), and 851, possession of a firearm in furtherance of a drug trafficking crime, in violation of 18 U.S.C. § 924(c)(1)(A), and being a felon in possession of a firearm, in violation of 18 U.S.C. § 924(g)(1).

Defendant Hoffman has filed a Motion To Suppress (#16). In his motion, defendant Hoffman seeks to suppress evidence taken from his person on June 17, 2006, and statements he made to law enforcement officers subsequent to his arrest. Defendant Hoffman's Motion To Suppress was referred to United States Magistrate Judge Paul A. Zoss, pursuant to 28 U.S.C. § 636(b). On October 17, 2006, following an evidentiary

hearing, Judge Zoss filed a Report and Recommendation in which he recommended that defendant Hoffman's Motion To Suppress be denied. Judge Zoss concluded that the totality of the circumstances justified law enforcement officers' intrusion upon defendant Hoffman's constitutionally-protected interest to be free from unreasonable search and seizure. Judge Zoss also found that as a result of the officers witnessing defendant Hoffman's violation of at least two laws, the officers had probable cause to arrest defendant Hoffman and to lawfully search him incident to his arrest. Judge Zoss further concluded that because defendant Hoffman's arrest was lawful, his later statements to the law enforcement officer need not be suppressed pursuant to *Wong Sun v. United States*, 371 U.S. 471 (1963). Therefore, Judge Zoss recommended that defendant Hoffman's Motion To Suppress be denied in its entirety. Neither the government nor defendant Hoffman have filed objections to Judge Zoss's Report and Recommendation.

## B. Factual Background

In his Report and Recommendation, Judge Zoss made the following findings of fact:

> Officer Tyler has been with the Sioux City Police Department since January 3, 2006. He came to the department after two years as a correctional officer with the Woodbury County Sheriff's office, and successful completion of the Iowa Law Enforcement Academy, where he received basic peace officer training. On June 27, 2006, Officer Tyler was in the twelfth week of the Sioux City Police Department's sixteen-week initial training period, which requires new officers to be accompanied by another officer when they go out on patrol. On that date, Officer Tyler was on patrol in a marked patrol car, accompanied by Officer Chad Sheehan. The officers were patrolling District 4 in Sioux City, Iowa, a busy district for drug, weapons, and gang activities. Officer Tyler testified that

2

his specific focus is drug crimes, and he estimated he had made one to two arrests per day in and around District 4 during the weeks immediately preceding Hoffman's arrest, including one drug arrest the day before Hoffman's arrest, in an area about four blocks from the incident in question in this case. Officer Tyler had never been involved in a chase situation prior to June 27, 2006.

On June 27, 2006, at about 6:40 p.m., the officers were on routine patrol, traveling westbound on 14th Street. At the intersection of 14th Street and Jones, Officer Tyler observed two vehicles, facing in opposite directions, pulled up next to each other in the traveled portion of Jones. The vehicles blocked the roadway such that no other vehicles could go around them. Three pedestrians were standing between the vehicles, talking to the drivers. Another pedestrian was standing to the west of the two vehicles. Officer Tyler pulled up behind one of the vehicles. When the pedestrians saw the patrol car, they walked away in separate directions, and the two vehicles went on their way. At this time of the evening, in late June, it was still full light outdoors. The officers followed the vehicle in front of them as it drove north on Jones to 15th Street, where the vehicle turned left. As they continued following the vehicle, it made two more left turns, ending at a stop light at 14th and Jackson, one block west of the point where the officers began following, and in the opposite direction from the vehicle's initial direction of travel. Officer Tyler pulled into the left-turn lane, next to the vehicle, a white Cadillac. He observed a woman driving the vehicle. The woman raised her arm up and turned her head away, as though she did not want to be seen. When the light changed, the Cadillac proceeded southbound on Jackson, and Officer Tyler turned left onto 14th. The officers had decided that instead of following the Cadillac, they would return to the intersection at 14th and Jones, to follow up with the pedestrians.

When the officers arrived at the intersection at 14th and Jones, three of the four pedestrians were still visible in the area. One individual was walking across a park at the northeast corner of the intersection. Two others were walking (though not together) southbound on Jones. One of the two individuals was walking at a normal gait. The other individual was walking hurriedly away from the scene. He had his right hand in his pocket, and he repeatedly looked over his shoulder to see where the patrol car was. Officer Tyler recognized this individual, later identified as Hoffman, as a man who had been standing between the two cars when they were stopped at the intersection. He recognized Hoffman's long, curly hair and his clothing – cargo-type pants in a camouflage print, a dark blue or black ball cap, and sunglasses with a silver frame. Officer Tyler recalled that Hoffman had been talking with the woman driving the Cadillac when the officers first arrived at the scene.

Officer Tyler testified that when he is on patrol, he looks for things that are unusual or out of the ordinary. He found Hoffman's actions to be unusual, and he decided to make an investigatory stop of Hoffman. Because Hoffman was walking quickly, Officer Tyler pulled up a couple of car lengths in front of Hoffman so the officers would have time to exit their vehicle before Hoffman reached the patrol car. As Officer Tyler pulled up, Officer Sheehan got out of the patrol car. Hoffman stopped, turned, and cut between two parked cars, obviously changing course to avoid coming into contact with the officers. Officer Sheehan told Hoffman the officers wanted to speak with him, and Officer Tyler, who now was out of the patrol car, told Hoffman to remove his hand from his pants pocket. Hoffman responded, "Why?" Officer Sheehan stated the officers would like to speak with Hoffman for a moment. Hoffman then began to flee the scene westbound, and the officers gave chase. The entire time Hoffman was running from the officers, he continued to keep his right hand in his pants pocket – something Officer Tyler

found very strange, and which raised his concern about what Hoffman might have in his pocket.

The officers chased Hoffman through the 1300 block of Jones, between two houses, and through a group of five to eight children. Officer Sheehan yelled at Hoffman to stop or he would be "Tased." Hoffman continued to run, still with his hand in his pocket. He turned north into an alley. There was a utility pole in the alley, and when Hoffman reached the pole, he slowed briefly and turned to look over his shoulder at Officer Sheehan, who was the closest of the two officers to Hoffman. It appeared to Officer Tyler that Hoffman might be trying to take cover behind the pole, which was close to a building. Officer Tyler drew his firearm because he was concerned that Hoffman might have a weapon in his pocket. Although he had not seen a weapon, Hoffman's right hand remained in his pants pocket. When Hoffman turned to look at Officer Sheehan, Hoffman's back was to Officer Tyler. Officer Tyler testified the ideal target for Taser deployment is into a person's back. He drew his Taser with his left hand, still holding his firearm in his right hand, and deployed the Taser onto Hoffman's back. At almost the same moment, Officer Sheehan also deployed his Taser onto Hoffman's body.

When the Tasers hit Hoffman, he immediately stiffened up and fell to the ground. According to Officer Tyler, the Taser cycle lasts five seconds. Then the signal stops, and the Taser must be redeployed again. The officer stated that during the five-second cycle, Hoffman would have been unable to move his muscles voluntarily, but after the five-second interval, Hoffman would have been able to comply with the officers' directions. Officer Tyler repeatedly told Hoffman to remove his hand from his pocket, but Hoffman continued to keep his hand in his pocket. In addition, Officer Sheehan told Hoffman to stay on his stomach, but Hoffman rolled over onto his side and began attempting to sit up. Officer Tyler viewed Hoffman's actions as an increased threat, and he and Officer

Sheehan both activated their Tasers again for another five-second cycle. Officer Tyler stated Hoffman was trying to yell something at the officers, but he never understood what it was Hoffman was attempting to say.

After the second stun ended, Officer Tyler again repeatedly told Hoffman to remove his hand from his pants pocket, and Officer Sheehan continued to tell Hoffman to stay on the ground. Hoffman failed to remove his hand from his pocket, and Officer Tyler deployed his Taser a third time. When this third cycle stopped, Officer Tyler again directed Hoffman to remove his hand from his pocket, and Officer Sheehan told Hoffman to remain on the ground and put his hands behind his back. Hoffman still did not remove his hand from his pocket, but he did place his left arm behind his back. Because Hoffman's right hand remained in his pants pocket, Officer Tyler was concerned that Hoffman might attempt to fire a weapon from inside his pocket. Officer Tyler moved away from Hoffman at a 45-degree angle, to remove himself from Hoffman's line of fire. Officer Sheehan also was moving to another vantage point. Officer Tyler then deployed his Taser a fourth time. During this Taser cycle, Officer Sheehan put his hands on Hoffman to restrain him. When the cycle ended, Hoffman finally removed his hand from his pocket. Nothing was in his hand. Officer Sheehan put Hoffman in handcuffs while Officer Tyler maintained his defensive position with his firearm drawn. A third officer then arrived at the scene. With Officer Tyler continuing to stand guard, Officer Sheehan and the other officer searched Hoffman. Inside his right pants pocket, where Hoffman had kept his hand, the officers found a loaded handgun. Also found on Hoffman's person were a small quantity of methamphetamine, some cash, and drug paraphernalia.

After Hoffman's arrest, he was taken to a hospital, at his request, before he was taken to the jail. Later, at the jail, Hoffman apparently gave a post-*Miranda* statement to an ATF

6

>agent. (*See* Doc. No. 16-2, p. 4; Doc. No. 22-2, p. 2)
>
>>Officer Tyler testified he has received training in use of the Taser, and it is the policy of the Sioux City Police Department that a Taser is considered the least violent option to deal with a resistant or combative suspect due to the lower risk of injury to officers or suspects than other options, combined with the effectiveness of the Taser. According to the officer, the Taser is "very safe," and he is not aware of any deaths occurring from Taser deployment. Officer Tyler also was carrying an Asp baton at the time, but he explained that in addition to the Taser's being the preferred method of force, he carries his baton on his right hip and he would have had to re-holster his firearm in order to remove the baton.

Report and Recommendation at pp. 2-6 (footnotes omitted).

## II. *LEGAL ANALYSIS*

The standard of review to be applied by the district court to a report and recommendation of a magistrate judge is established by statute:

> A judge of the court shall make a de novo determination of those portions of the report or specified proposed findings or recommendations to which objection is made. A judge of the court may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate [judge].

28 U.S.C. § 636(b)(1).

The Eighth Circuit Court of Appeals has repeatedly held that it is reversible error for the district court to fail to conduct a *de novo* review of a magistrate judge's report where such review is required. *See, e.g., Hosna v. Groose*, 80 F.3d 298, 306 (8th Cir.) (citing 28 U.S.C. § 636(b)(1)), *cert. denied*, 519 U.S. 860 (1996); *Grinder v. Gammon*, 73 F.3d 793, 795 (8th Cir. 1996) (citing *Belk v. Purkett*, 15 F.3d 803, 815 (8th Cir.

1994)); *Hudson v. Gammon*, 46 F.3d 785, 786 (8th Cir. 1995) (also citing *Belk*).

As the court noted above, no party has filed an objection to Judge Zoss's Report and Recommendation, and it appears to the court upon review of Judge Zoss's findings and conclusions, that there is no ground to reject or modify them. Therefore, the court **accepts** Judge Zoss's Report and Recommendation and orders that defendant Hoffman's Motion To Suppress is **denied**.

**IT IS SO ORDERED.**

**DATED** this 17th day of November, 2006.

_____
MARK W. BENNETT
CHIEF JUDGE, U. S. DISTRICT COURT
NORTHERN DISTRICT OF IOWA